ERB & GRAY SCIENTIFIC, INC. *v.* UNITED STATES (No. 5209)*[1]

United States Court of Customs and Patent Appeals, April 7, 1966

*Glad & Tuttle, Schultheir, Laybourne & Dowds, Edward N. Glad* for appellant. *John W. Douglas,* Assistant Attorney General, *Andrew P. Vance,* Chief, Customs Section, *Charles P. Deem* for the United States.

[Oral argument February 7, 1966 by Mr. Glad and Mr. Deem]

Before RICH, Acting Chief Judge, and SMITH, and ALMOND, Associate Judges, and Judge William H. Kirkpatrick**

*C.A.D. 875.
[1] Petition for rehearing denied July 28, 1966.
**United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate *in place of Chief Judge Worley,* pursuant to provisions of Section 294(d), Title 28, United States Code.

Smith, Judge, delivered the opinion of the court:

This appeal [2] by the importer requires us to decide:

1. Whether there is substantial evidence in support of the findings of fact by the United States Customs Court, including its finding that no option was available to the importer with respect to payment of the $3,500 sum in connection with its purchase of the instant merchandise.

2. Whether, as a matter of law, an amount included in the purchase price to the exclusive distributor which relates to general expenses of the manufacturer/seller in maintaining an office in the United States for the provision of essential services, not otherwise available, in connection with the installation and maintenance of the manufacturer/seller's product in this country can properly be considered as includable in the export value of the product.

At the outset it is to be noted that the jurisdiction of this court in appeals relating to the reappraisement of merchandise is confined solely to questions of law. Thus the question to be determined here is whether as a matter of law there is substantial evidence in the record to support the findings of fact of the Second Division of the Customs Court. *H. S. Dorf & Co.* v. *United States*, 41 CCPA 183, 189, C.A.D. 548. See 28 USC 2637.

The context in which the issues are here presented will be best understood by summarizing salient portions of the record which consist of the official papers, certain documentary evidence adduced by the parties as more particularly described in the opinion of the appellate term, and the oral testimony of one witness, Mr. Carl H. McBain, called by the importer.

The merchandise in controversy consists of an "Hitachi" electron microscope, Model HU-11, exported from Japan on or about November 25, 1961. The microscope was entered at a value of $13,500 and appraised at a value of $17,000, which included a sum of $3,500 designated on the commercial invoice as "New York Office Service and Operation Fee." The parties agreed that the proper basis of value was export value as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

The importer claimed that the above mentioned sum of $3,500 was not properly a part of the export value of the microscope and that the correct export value was the entered value. It was stipulated between the parties that if the so-called fee was found to be properly included in the export value, then the appraised value was correct; and that, on the other hand, if the court found the so-called fee was not properly a part of the export value, then the entered value was correct.

---

[2] From the decision and judgment of the United States Customs Court, Second Division, Appellate Term, 54 Cust. Ct. 791, A.R.D. 186, in which the appraised value of the involved merchandise was held to be the proper dutiable value, and in which the decision and judgment of the trial judge, 52 Cust. Ct. 583, R.D. 10768, to the contrary was reversed.

The statute involved is section 402 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956. The pertinent provisions thereof are as follows:

Section 402(b):

Export Value.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

Section 402(f) (1):

The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise, without restrictions * * *.

The imported microscopes are manufactured in Japan by Hitachi, Ltd. (hereinafter referred to as Hitachi). They are distributed by Hitachi's wholly owned subsidiary Nissei Sangyo Co., Ltd. (hereinafter referred to as Nissei) for domestic consumption and for exportation. By agreement with Nissei, the importer Erb & Gray is the exclusive U.S. distributor for the Hitachi electron microscope.

The microscope in question is a complicated technical instrument, requiring a skilled, trained operator in its operation. It is an electronic instrument which produces magnifications of up to 250,000 X with such resolution that they may be photographically enlarged by as much as 10 times to provide possbile magnifications of 2,500,000 X. Installation and checking of such a microscope is complicated and requires, on the average, from two to three weeks' time. However, depending upon the particular problems and requirements of each installation, this installation time may in some instances be as much as from five to ten weeks.

Under the agreement between Erb & Gray and Nissei, the responsibility for installation and servicing of the microscopes in the U.S. was assumed by Erb & Gray. To discharge this obligation, Erb & Gray arranged through Nissei for Hitachi to provide factory trained service engineers to install and service the microscopes with Erb & Gray paying their expenses.

When Erb & Gray originally began importing these microscopes, it paid Nissei $12,500 per instrument. The factory-trained engineers who came to America to install the first units were paid directly by Erb & Gray for all their expenses while in the United States.

Originally this amounted to some $400 per month for living expense plus traveling expenses. This arrangement continued until about January of 1960 when there were five Japanese service engineers in the United States. At the time of trial Erb & Gray were still relying on Japanese engineers, some seven to nine in number who were required to install and service the microscopes after their importation and sale.

These Japanese engineers, while in the United States, were supervised by the New York office of Nissei. By the end of 1959, Nissei concluded that the expense of its New York office was too great, and accordingly, it proposed either to raise the purchase price of the microscopes or to close the New York office. At this time Erb & Gray agreed to pay $3,500 additional per instrument to Nissei allegedly as a contribution to meeting Nissei's office expense.

There was, in addition, a $1,000 increase in the purchase price of the microscope, effective some months after January 1960 and after Erb & Gray had begun paying the additional $3,500 payment for the assistance and services made available through Nissei's New York office. The new price of the microscope thus became $13,500, both at home and for export F.O.B. Yokohama, Japan.

The $3,500 additional charge, above and beyond the seller's price at which it offered the instruments, was paid by Erb & Gray to the New York office of Nissei purportedly for assistance and services in connection with installation and maintenance of instruments sold by Erb & Gray. This included such items as repair and overhaul of the units, breakdown and other emergency service, training of operators, etc., including supervision of engineers from Japan and rendering assistance to them, and in some cases to their families, with language and other environmental adaption problems. Full responsibility for liaison with the factory in connection with operational difficulties experienced by customers of Erb & Gray, attention to urgent technical problems in American laboratories and plants, arrangements for personal inspections and counsel by engineering consultants from the factory, and visits of administrative personnel from Japan also were provided through Nissei and presumably were included in the $3,500 payments per unit sold. Expenses for providing this assistance and service also included salaries of Nissei's New York office staff, rent, travel and other miscellaneous direct and overhead expense, transportation of Japanese service engineers to this country, travel expense of consulting and administrative personnel to and from Japan and within the United States, and other items.

It is appellant's position as stated in its brief that the $3,500 payment to Nissei per microscope

* * * was always separate and distinct from the $12,500 or $13,500 purchase price payment * * *. Such payment was made, not to purchase or acquire

possession of the instruments, but to help offset the expenses of the New York office in assisting Erb & Gray in the discharge of its responsibilities for installation and service of the instruments after importation * * *, and thus to prevent the closing of the New York office and termination of such assistance * * *. Until this arrangement went into effect, Nissei Sangyo had been bearing the expense of transporting the technical people to the United States, the expense of supervising them in the United States, and other miscellaneous expenses that attached in the United States in connection with the installation and servicing of the instruments, * * * while Erb & Gray paid just part of the actual salary and living expenses of the technicians themselves * * *. The $3,500 was thus paid for after-import services; it was in no sense payment for the merchandise itself * * *.

The trial judge found the evidence established that the $3,500 so-called "fee" never was intended by the parties as part of the purchase price and accordingly formed no part of the value of the microscope for appraisement purposes, citing *Brauner & Co.* v. *United States*, 44 Cust. Ct. 661, R.D. 9673. In the course of the opinion, the trial court stated:

* * * The testimony leaves no doubt that the instrument in question is a highly technical, complex mechanism requiring the skill of specially trained men for its installation and maintenance, and that such workmen were available only by obtaining them through the manufacturer of the merchandise in question.

The trial court stated further:

In my opinion, there was never any indication on the part of the manufacturer and the plaintiff that each individual microscope should cost more than $13,500. The arrangements for service charges covering installation and maintenance were really items incurred after the merchandise had become part of the commerce of the United States.

The appellate term reversed the decision and judgement of the trial court, pointing out that whereas in the *Brauner* case, supra, the fee paid by the importer was an optional remittance for services which embraced installation, assistance, and technical advice:

[t]his option was not available to the importer in the instant case. Once it prevailed upon the shipper to continue maintaining its New York office, it obligated itself to include, as part of the purchase price, the agreed contribution toward the expenses of that office. It became a condition of the purchase of each instrument, inasmuch as these microscopes were no longer sold to plaintiff at a price which did not include the said service fee.

On the authority of *United States* v. *Int'l Commercial Co.*, 28 Cust. Ct. 629, R.D. 8112, the importer argued that the $3,500 payment was not properly includable in the export value of the instant microscope because of its relationship to expenses incurred subsequent to exportation. The appellate term disposed of this argument stating:

We are of the view, however, that, in the determination of export value, the emphasis is not upon when the issuable charges accrued, but upon what was the value in the principal market. If the disputed charges, whenever they may, in fact, accrue, are always included in the price at which the merchandise is

sold, then they are part of that price and of the value which derives from that price. *United States* v. *Paul A Straub & Co., Inc.*, 41 CCPA 209, C.A.D. 553; *Albert Mottola, etc.* v. *United States*, 46 CCPA 17, C.A.D. 689.

The price at which the Hitachi HU-11 microscope was sold to the importer herein was $13,500, plus $3,500, and this instrument was never sold for exportation to the United States in any other way. Accordingly, there seems no escape from the conclusion that the so-called service fee was properly included in the appraiser's computation of the export value of the instant merchandise.

■ The basic principle, statutorily prescribed, is that the export value of merchandise is based on the price at which such merchandise is either sold, or in the absence of sales offered for sale, at the time of exportation of the merchandise being valued. If, then, as urged by the appellant, the instant $3,500 sum which the importer was contractually obligated to remit in connection with the importation of the instant microscope should have been excluded from the export value of that microscope on the authority of the so-called inland freight cases, including *Mottola* v. *United States*, 46 CCPA 17, C.A.D. 689, and *United States* v. *Paul A Straub & Co.*, 41 CCPA 209, C.A.D. 553, the record must show that on or about November 25, 1961 the HU-11 Hitachi electron microscope was sold or, in the absence of sales, offered for sale for exportation to the United States at a price which did not include the $3,500 sum.

Instead, what the record shows is that on or about November 25, 1961, the appellant was the exclusive distributor in the United States of Hitachi microscopes and obviously the exclusive purchaser of those instruments in Japan for exportation to the United States and that the Hitachi electron microscopes were neither sold nor offered for sale for exportation to the United States to any purchaser other than Erb & Gray.

■ There is substantial evidence to support the appellate term's determination that the contested sum of $3,500 was included by the manufacturer/seller in pricing the instant microscope to Erb & Gray. Since from on or about November 25, 1961 such microscopes were not available for exportation to the United States at any price to anyone other than Erb & Gray, the appellate term correctly applied the law of the *Mottola* and *Straub* cases, supra, to the facts of this case. This requires a finding that the contested sum of $3,500 per unit was properly included by the appraiser in determining the export value of the instant merchandise. Also, we think the appellate term properly distinguished *Brauner & Co.* v. *United States*, supra, as concerning a situation where the merchandise was available, *at the buyer's option*, with or without utilization of and concomitant payment for technical assistance available from the manufacturer, but also presumedly available elsewhere.

The testimony of McBain, we think, constitutes substantial evidence in support of the appellate term's determination that the so-called fee

was part of the purchase price and that its payment was not contractually optional. He testified that Hitachi and Nissei were trying to increase the price, and that Erb & Gray were trying to hold the price down and testified:

They had tried to increase the price on us, and we had tried to continue to hold the price down for the complete year of 1959, and they pointed out that their expenses were very high, and although the price of the microscope remained the same in Tokyo as the price that they were selling it to us, they felt that the expenses were too high. They finally came to the conclusion at the end of 1959 that the main complaint was that their expenses in the United States were just too great. They had to spend money to send the engineers over here. They had to have their New York office—they had employees there, they had two or three men, plus girls, the expenses of the office—and they had administrative people coming over here to visit to see that the job was being done properly, and they had consultants in electron microscopes coming over to this country. Their expenses were just too high, and so they wanted to increase the price of the microscope. When we heard that it was the office expenses and the administrative expenses that they were complaining about, the aftercare, we came to an agreement that we would pay $3,500 on each instrument sold to the New York office for their upkeep.

McBain testified also:

During the year of 1959, the discussions over in Tokyo, and the communications stated, were to the effect that the price should be raised, and Erb & Gray said no, it shouldn't be raised. We got to the discussion regarding aftercare of the microscope and the New York office expenses, and we agreed at that time with them that we help them with this expense, which came to $3,500 per instrument. We did it on an instrument basis because we felt that if we only sold four or five instruments, that's all we could afford to give them, even though their expenses might have been much higher than that.

 * * * * * * *

XQ. Well, I was going to ask you this question. You pay the $3,500 because you have to, because they require that you pay it to get these goods? A. No, because we agreed to pay to help the New York office, and all of the expenses and aftercare.

XQ. And this is part of the arrangement you have with the seller to obtain your merchandise? A. Of course.

We think it significant that McBain also testified:

We agreed to pay what we had been paying, and to help them with their expenses of the New York office in the amount of $3,500 per instrument sold.

It seems reasonable upon perusal of the entire record in this case that the services provided by Nissei's New York office were essential to the successful merchandising of Hitachi electron microscopes by the appellant, and that the $3,500 so-called fee constituted in essence a disguised increase in the price of model HU-11 microscopes over that prevailing in 1959 in order to insure adequate compensation to the manufacturer/seller for the increased expenses necessarily incurred and continuing sale for exportation to the United States of the instrument.

 We conclude, therefore, that there is a substantial basis in the record as a whole to substantiate the statement in the opinion of the appellate term that:

It is reasonable to conclude that a seller of merchandise ordinarily computes all of his expenses before arriving at a price which he must receive for his merchandise, and it seems obvious that whether expenses are incurred in the country of exportation or in the country of importation, the price should cover them.

Actually, the New York office of Nissei Sangyo was no more than a convenience for the importer of the instant merchandise. It facilitated contacts between the two organizations, but it performed no specific functions with respect to the installation and servicing of any particular instrument. These latter items were paid for directly by the importer and, under the principle of the *Brauner* decision, supra, form no part of the value of the microscopes. But the general expenses of running an office in New York have no direct relationship to any given machine, and the decision to break down the cost between the microscope *per se* and the overhead of the New York operations must be considered an arbitrary arrangement not properly reflective of the export value of the subject merchandise.

In view of the foregoing we think it is clear (1) that there is substantial evidence in support of the findings of fact of the appellate term that there was no option available to the importer at the time of importation with respect to the $3,500 sum in issue, and (2) that as a matter of law the inclusion of such a sum under the circumstances of this case as a part of the purchase arrangement is properly included in the export value of the merchandise in issue.

The judgment of the appellate term is therefore *affirmed*.

MARTIN, J., took no part in the consideration or decision of this case.